We have an admission this morning. Mr. Asher, will you come forward? Colleagues, I move the admission of Shawna Shah, who is a member of the Bar, in good standing of the highest courts of Virginia and the District of Columbia. She has been my law clerk, so I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications, with one exception, which is that she has chosen to leave me at the end of this period, which shows a flaw in her judgment, but not one that should preclude us from admitting her to our Bar. I will miss her. I so move. Thank you. With the agreement of the panel, I'm very pleased to grant Judge Plager's motion. Would you approach the clerk? Would you recommend? Do you solemnly swear or affirm that you will comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I will. Welcome to the Bar of the United States Court of Appeals to the Federal Circuit. Thank you. Thank you. Welcome to the Bar. Thank you. We will proceed. The first case on the argued schedule this morning is number 2010-14-16, AstraZeneca against Mr. Misora Binder. Mr. Ward, are you going first? Yes, I am, Your Honor. Proceed. May it please the Court, my name is Jeff Ward, and I represent Appellant Mora Binder. Of the time allotted to me, I would like to reserve two minutes for rebuttal. Mr. Ward, you should speak up so that you have quite an audience here came just to hear your performance, so you should let them do that by speaking up. Well, I hope I'm worthy of that then, but I will speak up. Okay. There's a large number of appellants in this case, as you know, and a number of different issues, so there's three of us appellants that we'll be arguing today. I'm going to tackle the issue of improper issue and obviousness. Mr. Steven Maddox will deal with inequitable conduct, and Mr. Robert Briesplatt will deal with the Apotex infringement issue. Okay. We apologize in advance for any complications or confusion that may arise for the three of us trying to parse this thing. Thank you. Thank you. So I'll move into reissue. The court erred as a matter of law in determining that reissue was proper because there was absolutely no evidence that an error was made with respect to the claims that it issued in the 440 patent. Under Section 251, reissue is authorized only if there is an error, and in every case where the propriety of a reissue was upheld, it was either testimony or some other form of patent agent involved explaining the error and how it occurred. So it's not an error if your claim turns out to be too broad? It may or may not be an error. It can be an error if the result of the claim being too broad is an unknowing claim. For example, let's say you make the claim too broad in view of prior art of which you're not aware. That's a classic case of error that's been corrected by reissue, but that is not the case here. I guess I don't understand. You have to await an adjudication that it's too broad and invalid before you can attempt to reissue the patent to correct the breadth? No, I think what the reissued statute would allow would be if at some point you come to the conclusion without having a trial, not awaiting a trial, that your claim is too broad, for example, based on a reference that you didn't know about, then that's a classic case for reissue. But what we have here is a situation where Shinogi put in absolutely no evidence with respect to the Sandoz reference that they, A, didn't understand what it meant or wrote their claims in ignorance of what it meant. So we have a situation here where Shinogi understood the Sandoz reference. They understood the scope of the Sandoz reference. They made intentional strategic decisions to put their claims in in a certain way with a very broad claim one and some dependent claims so that they could secure the broadest possible protection. That was a knowing, intentional choice, which is not remedied by reissue. Did I hear you say you have to know you're making a mistake at the time you make it in order to correct it later by reissue? No, you don't have to know that you're making a mistake. For example, I could have written a broad claim without knowledge of a reference that later comes to my attention that if I had at the time, I would have realized I made a mistake, and that's proper. The situation we have here, though, is reissues not proper where somebody has a reference in front of them. They understand that reference. They draft claims. They pursue those claims. They make intentional decisions with full knowledge of that reference, and they later come to regret the fact that they didn't do some things. That's not a proper basis for reissue. That's not error. And there's no case in the federal, there's no case that I've seen where error is allowed under that sort of a circumstance. If you look at the Weiler case, as they state there, you can't have an error that's merely just premised on an inventor's failure to understand how to claim things or an attorney's ignorance of something with a bare declaration. You need to provide some evidence. And in this case, no evidence was provided. There were three employees of Shinogi that came to trial and testified. Each one of those people had an opportunity to say there was an error, there was a mistake. We didn't understand what the Sandoz reference covered. We didn't understand it when we wrote the claims. Not a single one of those witnesses said that. In contrast to that, what we have here is evidence that shows the opposite, that the claim scope is for strategic reasons. And the most powerful evidence on this is the evidence from Mr. Tamaki, who testified that at a certain point in time, 1992 at least or 1993, Shinogi became aware of the Sandoz reference and the overlap, yet chose to do nothing about it because they said, well, even if claim one might be invalid, it's not necessarily the case where an overlap is, that doesn't bother us because we still have claims two and three, which are not overlapped and cover what we want to cover. And so what happened is they proceeded along that path. And that's a situation where error is not established. That's the evidence we have here. We have other evidence as well, relating to the inventor signing supplemental declarations, numerous claim meetings where the prior art was in front of everybody, discussed, and we have other evidence. And in stark contrast to that, there's nothing from Shinogi about this error. I'm already into my rebuttal time. I'm happy to answer any questions you have with respect to reissue, or if you have a question with obviousness, I'll answer that. Otherwise, I will yield to Mr. Maddox. I think proceed with the argument. Thank you very much. Mr. Maddox. Good morning. Please proceed. Thank you. May it please the court, I'm here to discuss the inequitable conduct judgment. I'll repeat Judge Plager's suggestion.  Here with respect to the inequitable conduct judgment, and with respect to the inequitable conduct judgment in particular, the issue of intent, which is really front and center, but below and here. I'd like to start by noting that this is not the usual intent case that comes your way up to this court. It's not a question of whether someone guessed wrong or right about whether something was material, and then went and disclosed it, and had to disclose it. This is a situation in which both individuals, Kitamar and Shibata, knew of the references, believed they had a duty to disclose them, but didn't. And, as Judge Farnan said, The question is why. Exactly. As Judge Farnan said, there's a reasonable inference of intent, and then we're here because we submit there was no competing reasonable inference of no intent. Is this a question of fact? Yes, there was the factual findings upon which Judge Farnan rested his inference of no intent. Well, the key question, the materiality, there's an argument about whether the judge properly found high materiality or low materiality. That's often washed away by Thereset. You would agree with that? I would agree. So the only question then is, what did these people know, and when did they know it? And really, why did they know it, or why did they do what they did? And the trial judge made a finding of fact that this was ignorance, incompetence, negligence, stupidity, any number of labels you want to put on it, but no deceptive intent. Is that not a possible finding in this case? It's not a reasonable finding, and certainly not as reasonable as a finding. Certainly not as reasonable as the other, and if you and I were the fact finder, we might find the other, but we're not. So when we deal with a finding of fact, which underlies the ultimate judgment of inequitable conduct, what is our standard of review? Clearly, erroneous. Yeah, not reasonable. The issue that we submit is whether the finding of fact that underlined this, his finding was that there was an equally reasonable inference, and therefore, no inequitable conduct. And we are submitting that the facts, the findings of fact on which he based his inference, that he says was equally reasonable, that those findings were clearly erroneous. Also, with respect to Mr. Shibata... Why are they clearly erroneous? Why couldn't he believe that these people were incompetent rather than evil? I mean, he's the trial judge. Yes. Right? Yes. But the finding of fact issue is not whether these people are evil or not, it's whether the actual evidence there is equally supportive of an inference of no intent as it is of intent. No, that's a question of balancing and judging the witnesses, and judging the case, and deciding what seems to be the best answer. There doesn't need to be a reasonable answer. I've sat up here as my colleague, so I haven't affirmed many fact findings. I scratch my head that I'm pressed to find clear error. Well, at some level, then, it comes down to... I mean, your problem is Therosense. Therosense cut the ground out from under your position. Right? No, Your Honor. Because at some level, Judge Farney essentially applied a version of Therosense, well, before Therosense came, he was looking at Star Scientific and that. What really happens here, the issue here is, what does Therosense mean when it says single most reasonable inference? Does it mean that we have to come forward with facts that not only support a reasonable inference of intent, but actually preclude any other possible inference, regardless of its reasonableness? Or does it mean we just have to have facts that make the most reasonable inference, intent to deceive? It is a factual issue. I'm sorry. How do you read Therosense on that dichotomy? I read it as all we need is the facts that make the inference of intent the most reasonable, that it requires an assessment of relative reasonableness, and that you can commit clear error in making that assessment. Because I think the other reading of Therosense, which is that the facts would have to preclude any scenario that can be dreamed up, and that someone can say, I was too busy, I was just a busy guy. That would make the Clearing and Convincing Standard look a lot more like Beyond a Reasonable Doubt. Seems to me you've just made his case, because what you argued is that this is a problem of weighing the evidence, and the fact finder is going to weigh the evidence. We're not the fact finder. What I'm suggesting is, the conclusion the judge reaches has to be, this is reasonable, and this is equally reasonable. And I'm saying, in making that conclusion, the judge should be subject to review as to whether the facts he's basing that conclusion on were clearly or erroneously found. I see I'm in rebuttal, but I'll take just a moment more. With respect to Kitamura, we suggest that it can't be equally reasonable to infer that she didn't think she had a duty. She said she had a duty. But even if a reasonable inference under Therosense can contradict the direct evidence and admission of the witness, the factual findings on which the judge based his competing inference were clearly erroneous. For instance, Joint Appendix 38. He said, well look, it's equally reasonable because the internal documents judged the compounds to be novel. And he referred to the search report at 2224. You look at that search report, there was no patentability determination in that search report. On its face, it recites that the 7 compounds searched. They searched a database of existing compounds, found that those 7 were not in a database of existing compounds, and therefore, in the translation, called that novel. That was not a judgment on patentability or novelty or materiality. That was simply, these particular compounds you've asked us to search about are not in this database. That was clear error to be basing an exculpatory inference on that type of fact finding. And with respect to Mr. Shibata, it wasn't really so much an inference as I was too busy. I was too busy, I was overwhelmed, but there was no actual evidence of that. It was simply him saying I was too busy, which suffers the same problem as I didn't have the intent. It can be said, and probably meant, that there isn't a lawyer in this courtroom who wouldn't tell you he was very busy or she was very busy. It's not a competing inference. The kinds of inference that you have recognized, we suggest, is, for instance, last week in the Cordes v. Boston Scientific decision. These inferences you look at  suggests it was reasonable for the lawyer or the patentee to have concluded that they did not have a duty. We have not found a case where you've looked at these inferences under Starr Scientific of, yes, they had a duty, no, they didn't dispose it, but we still think it's a reasonable inference that they didn't act with intent. I'm now at the end of my talk. Thank you. One more. I forgot Mr. Breisblatt. Don't be so eager. And actually, that's this whole case. If it pleases the Court, my name is Robert Breisblatt and I'm here on behalf of Apotex Corp. Apotex Corp. should not have been at this trial. It is not the submitter of the ANDA at issue. And there was no evidence it was the submitter of the ANDA at issue. That party was Apotex Inc. Apotex Inc. correctly made a motion after full discovery that jurisdiction was not proper against it in Delaware and the Court agreed. Apotex Inc. awaits trial down in the Southern District of Florida. AstraZeneca has not moved to dismiss that case. How did the Florida Court get personal jurisdiction over Apotex Inc.? Did it come into the case there? Apotex Inc. had brought a case actually in the middle district of Florida and then it was sued by AstraZeneca in Delaware along with Apotex Corp. Apotex Inc. disputed jurisdiction from the beginning in Delaware. But not in Florida where it had come in as a plaintiff. Correct. And the reason why Apotex Inc. accepts jurisdiction in Florida because it's required to do... It's warmer and if you're a Canadian company you want to sue in Florida. I understand that. Well, and more importantly it, in its notice letter, said that's where its agent for service, Apotex Corp., was located. And that's how it works. So it consented to jurisdiction. It's a foreign corporation. It consented to jurisdiction in Florida and the court in Delaware accepted that. And dismissed... Well, it didn't dismiss. It transferred. We still have dismissal in Delaware. That was disputed by AstraZeneca. They wanted the transfer. They understood and they still understand that the owner of this ANDA the one who submitted it was Apotex Inc. Apotex Inc. was not a party during this trial. Only Apotex Corp. was. You know what I don't understand? Suppose, for example at this stage the District Court's decision should be affirmed by this court. You're willing to accept all the consequences of an adverse decision as might arise in another forum? Or you're confident of the right to re-litigate all of the issues in the Florida forum? When you say you, who are we speaking about? Who are you representing? I'm representing Apotex Corp. in this courtroom. Apotex Corp. says we didn't infringe and that's why we've appealed the decision of the District Court. And that's why we're here. We weren't the submitter. To be an infringer under 271E4 E2 you have to be a submitter of the ANDA an ANDA that has a paragraph 4 certification and it cites to 355J when you look at 355J the submitter is the applicant. The applicant on the ANDA that was charged with infringement in Delaware is Apotex Inc. Not Apotex Corp. And Apotex Inc. awaits its day in court in Florida. Is Apotex Corp. a party to the Florida litigation? No. The only party that was transferred down was Apotex Inc. because they're the ones who submitted the application. And they're the ones who are being sued? They're the ones who are being sued and they're the ones in Southern District of Florida waiting for its day in court. And this case has followed the proper pattern. There was an MDL, multi-district litigation. That's why it's here as In Re Resuvistat. Apotex Inc. was part of the MDL. All of the discovery has been completed. As in all patent MDLs when discovery is completed and the case is ready for trial that is when a party can make a motion to dismiss or the case is simply sent back to the court in which it originally sat for its trial. We're awaiting our trial. The company is not involved in any of that other litigation and the only way you're going to be involved is if you're hooked into the Delaware suit. Is that correct? Yes. The only way Corp. was involved in this litigation, it was named in Delaware. We are a Delaware corporation. We couldn't move out on jurisdiction. We then took at trial. We submitted our evidence showing the only person who submitted the application was Apotex Inc. We tried this case on an infringement basis. That's why I was in Delaware. I reserve 11 or 10 seconds for rebuttal. Thank you. Mr. Lipson? Now. I may please the court. The inequitable conduct allegation fails as has been hinted at here because the trial court found based on the totality of the evidence and heavily grounded in its assessment of witness credibility that intentional deception was not the single most reasonable inference. Those credibility findings are subject to substantial deference in this court as this court noticed in the Corda's case. The factual findings were not clearly erroneous and the final judgment, the balancing of the evidence and the determination there was no inequitable conduct was not an abuse of discretion. And while it is argued otherwise, the factual finding which the judge made at JA40 that the evidence showed no more than a string of mishaps, mistakes, misapprehensions and misjudgments on the part of inexperienced and overworked individuals was well corroborated by the documentary evidence. This is not a case of naked denial. This is a case where there was these witnesses came from Japan, they testified, it was a lengthy trial, there were extensive documentary exhibits entered, the documentary exhibits fully corroborated the testimony of the witness. The report of Mr. Maeda when he came into the department after Mr. Yuzumi retired and found they were 10 to 20 people short, that they didn't have any patent attorneys at all even though the number of patent attorneys was a measure of how well they could protect their property. The log of correspondence that was being logged in by the clerical people, which is just a barometer, not all the work that's being done, but a barometer showed a very distinct increase in the workload. It was at least gross negligence wasn't it? I was afraid you were going to ask me that. Shouldn't we hold them liable just on principle? Are we going to encourage this kind of gross negligence behavior? If I may, the conduct was certainly regrettable. We have never asked to have it endorsed. All we have asked is for a recognition that it was not intentionally deceptive. It was a group of people who were not U.S. lawyers, who were not even Japanese lawyers or Japanese patent agents. They weren't even lawyers? Not lawyers of any kind. Well that's a sin in itself. You're normally exculpatory to not be a lawyer. They were working under conditions. We documented the departure of people in the department. Mr. Shibata was a brand new supervisor right when the office action came in. You can see in the record of the correspondence that responsibility got divided in an unaccustomed way. The correspondence got misdirected all over the place. Mr. Shibata's perception that the testing he was supposed to be doing was with respect to references that were already before the patent offices that he'd be submitting it to is corroborated by the memo he wrote when he said to his management people, gee, we're doing this testing but we think the examination in the U.S. was rather lenient in not requiring the testing. That's the sort of thing you say when you think they've got it and don't know why they didn't require it. We're not asking for endorsement. We're not even asking for forgiveness. You're asking us to interpret the statute narrowly, deceptive intent. Well, actually I'm asking for an application of theracents which basically says unless a true deceptive intention is the single most reasonable inference it's not an equitable conduct. And this is not a circumstance, we're not here really arguing. This is a fact finding? It is absolutely a fact finding. It's a fact finding based on credibility that is due substantial deference in this court. Now about Ms. Kitamura. The attack on her is really horribly unfair. All she did was draft a patent application to be filed in Japan and a bunch of other countries including the United States to file the application in all those countries and promptly to leave the company. And at the time she left, she testified and the trial court found it credible she hadn't given one iota of thought to what if anything in addition should be cited to the patent office in the United States for the unique requirement here for the duty of disclosure. She just didn't think about it at all. And even if it was her view that there was some kind of obligation to disclose references that encompass the claim which is not the standard by the way. She never went through that thought process and therefore never formed an intent to deceive notwithstanding the hyperbole that's been coming from the other direction. Now I think the court correctly notes that Theracense really vitiates the argument about Bayer was not proven to be but for material and Theracense makes clear that the alleged materiality is not to be considered in weighing the evidence of intent. And frankly the evidence, the objective evidence, the testimonial evidence, it all fits very nicely together. These were people who were poorly trained, who were overworked, who made some mistakes and they made a lot of mistakes. Sounds like the Court of Appeals. With the only difference that the Court of Appeals doesn't make mistakes. At least not any that I ever get fixed. If I may turn to the reissue point. Isn't the reissue issue very much the same problem as to whether they were grossly negligent or deceptively intending to play this game? Indeed it turns, that aspect of it The court finds that the nondisclosure occurred with deceptive intention which the trial court found it was not. Then access to the reissue statute was permitted. I understand their argument not to be that it was deceptive. They're trying to argue that it was deliberate. That somehow or other Ms. Kitamura intentionally drafted that claim so that it overlaps Sandoz and there's just not a shred of evidence that that was the case. She wrote it and the reissue cases, Wadlinger for example and there are several others that follow it say that error includes things that are done in a state of consciousness but are nonetheless wrong. And anybody who's drafted patent applications realizes how easy it is to make a claim drafting error in defining all the elements that go into these formulas. If you define one somewhat imprecisely you can accidentally sweep in a compound that may be disclosed in the prior art. It happens all the time. And there's no evidence that anything other than that happened here. An unintentional sweeping in of the prior art and it escaped everybody's attention passed uncorrected into the Japanese patent, passed uncorrected into the European patent, passed uncorrected into the U.S. patent. Was corrected in part fortuitously by the amendments that Ms. Shimizu happened to make to the case in the course of prosecuting it but a small area of very unobvious and obscure overlap remained. It had to do with so called benzyl thio and benzyl alkyl compounds that the inventors had not actually ever made but that were generically disclosed in the patent application. Now they say the inventors should have known of the overlap because they knew of Sandow's compound 1B at the Supplemental Oath. The Supplemental Oath referred to the amendment that actually excluded compound 1B from the scope of the claim. And there's no evidence at all that the inventors were any better at sifting through the language of patent claims than the people in the patent department or otherwise were aware of the error at the time. This is one of those classic kinds of errors like in Ray Harita where the claim turns out to have an overlap that was unintended and relief under the reissue statute has been requested and granted. The argument that we didn't prove it was error completely misplaces the burden of proof. If you look at section 282 of the statute satisfaction of the requirements of 251 is one of the defenses there. That's one of the defenses that's subject to the clear and convincing evidence burden of proof this court so held in the Bard case. And so all of that argument that Shianogi didn't do this and Shianogi didn't do that is entirely beside the point. The error was clear that there was the overlap. The witness testified that she didn't perceive any patentability problem with that claim when she drafted it. It passed undetected into the issued patent and is correctable. There is one point that was raised in the briefing but has not been raised here that I would like to address and that is there was citation to the principal business case for the proposition that this application was somehow barred by latches. And the short answer to that is that the 52 Act when it came in it established a two year limit for broadening reissues but no limit for narrowing reissues. It provided for intervening rights to protect the public in both cases from changes in the patent claim. And more appropriate to principal business that case relied upon a 1941 case, the Better Packages case, written by a Judge Hinks in Connecticut in 1941. Beautifully written and the rationale was the statute in 1941 required prompt disclaimer of any invalid claim otherwise all the claims of the patent were invalid. That's the way the statute read. And Judge Hinks said you know if it's invalid if you don't promptly disclaim a whole claim when you file a narrowing issue you're disclaiming part of it and therefore you got to do that promptly too. And that was the rationale. And nobody told the trial judge in principal business that in 1952 that statutory language was eliminated from the statute. And this is all laid out in Federico's Commentary to the New Patent Act which is reproduced in the Journal of the Patent Office Society March 1993 issue at page 209. So those provisions are no longer in section 253 and 288. There is no longer any requirement to promptly disclaim a claim. There is no time limitation on filing a narrowing reissue and in fact the intervening rights provisions take care of all that as this court held recently in the Tanaka case in answering Teller's argument that it's unfair to allow the patentee to present a narrower claim. The court there said we don't see a problem it's not taken care of by the intervening rights statute. I think on the issue of obviousness the trial court carefully laid out what the contentions of the parties were, carefully laid out what the law is, concluded that the analysis offered by the defendants was a hindsight reconstruction which indeed it was meaning that it relied on knowledge of the invention to pick a path through the prior art to get to the claimed invention and concluded that the evidence that AstraZeneca had offered on scope and content of the prior art and differences between the claimed invention and the prior art was at least equally plausible and those findings are not clearly erroneous and I think we've laid out in our brief there are a number of very surprising properties that come from this very special group that is in rosuvastatin including a special binding interaction with the enzyme that it inhibits that is not found in any other compound. There were also severe toxic effects when you used a similar group in the Parole compound that Shinogi tried to develop earlier and indeed the Sandose compound was jettisoned as a backup compound because they had an unfavorable toxicity profile also. All that said, we feel that the findings on obviousness are not clearly erroneous and that that should be affirmed. On the submitter issue the plain fact of the matter is the trial court's holding is consistent with the plain meaning of section 271E2 with the four other district court decisions that have addressed this issue which we cited in our brief and indeed with common sense. 271E2 does mention section 355 but it does so to identify the kind of application it's talking about not to provide the standards of who submits in accordance with 271E2. 271E2 is a patent law, it's not a food and drug law. Let me ask you this question. Certainly. It is clear from the record is it not that the application was submitted formally by Apotex Inc. We disagree. For this reason. Aren't they named on the They are named but the person the entity that signed it. I'm not talking about the people who handed the paper. Who is the named applicant under the ANDA? Let's take it one step at a time. There is a form that was filed. The named applicant under the ANDA is Apotex Inc. It said applicant Apotex Inc. That paper and the ANDA was signed by Apotex Corp. and required to do so by law. Let me ask you this. In order to bring Apotex Corp. into the pocket of Apotex Inc. don't you need to pierce the corporate veil? We're not trying to bring them into the pocket of Apotex Inc. We want judgment against Apotex Corp. who did in fact submit this ANDA. Let me put the question differently. Let's assume Apotex Inc., a Canadian corporation, had had the wisdom to come to Charles Lipsey and say would you please represent us? We don't know how to do these ANDAs and we understand you are the biggest ANDA man in the world. Would you please represent us and file our application for an ANDA? And would you please come up here and talk to us about how you're going to do it? And would you meet with us and help us fill out the forms? And then would you go to the appropriate people at the FDA and put in my application for an ANDA and sign it as my agent? And let's assume you did everything that Apotex Corp. did in this case. Would you then agree that you are liable for infringement? There's one thing Apotex Corp. did that you didn't mention, which is a critical distinction for the trial court's opinion, and that is Apotex Corp. intends to benefit directly from the ANDA by selling the product. You do too, Mr. Lipsey. You intend to benefit directly. A, you're going to get paid your reasonable fees, which I'm sure are very reasonable. And secondly, one reason why you're interested in doing this sort of thing is you see Apotex Inc. as a future client for an awful lot of good business. I mean, you're a rainmaker of the first class. So you intend to benefit also. What about that? I don't directly benefit by selling the approved ANDA product before patent expiration, which is the second prong of 271E2. So you're saying that a sales agent then becomes liable for infringement for selling the infringing product. What the cases, the four cases, and Judge Farnon held is I've read all those cases, and not one of them except one seems to be interested in piercing the corporate veil. I'm troubled as to how you can say that an agent is liable for infringement by the principal. The principal is typically liable for the acts of the agent, but I'm not aware of the fact that under agency law, agents are liable for the future acts of a principal, and I'm wondering how we get there. The act is submitting the ANDA. The word submit is not defined in the patent law beyond its plain meaning, and Apotex Corp. signed that ANDA and was required to sign it and verified the accuracy and promised to provide additional information. So did Mr. Lipsy when he represented them because Apotex Corp. was incompetent and couldn't do it. But Mr. Lipsy is not also planning to sell the ANDA product before patent expiration. So it's not that they signed as a submitter, it's because they're going to future benefit. Which is it? You can't have it both ways. I want to know what the rule is. See what I have my trouble, you've read those Mr. Corp. cases. I can't figure out what their principal is. I'm looking for a principal that will keep you from being liable for infringement when you represent Apotex Inc. in the future, unless you think you should be liable. No, I think the trial judge here gave us one. He's got two requirements. You are a sign and submit it and plan to benefit directly from the sale of the ANDA product before patent expiration. Those are the only people that he viewed as qualifying as submitters. Why? Because they're in bed, to use the vernacular, with Apotex and are going to be infringing. So we're going to pierce the corporate veil for that limited purpose. No, we're not piercing the corporate veil. Apotex Corp. How can you get one corporation liable for another without piercing the corporate veil? Because Corp. is by itself a submitter of the ANDA because of the posture it occupies. It signed the ANDA, it verified the ANDA and it plans to benefit from the sale of the product. Can you get there by interpreting the words submit in the statute? Yes. And there's nothing that there's nothing in the statute that suggests that. No, it says submit. It says give. Now, clearly, somebody who gives and who is not going to engage in the second prong of the act of infringement has not fulfilled the condition of the statute. Apotex Corp. So you could do this without being liable? I could do it without being liable because I don't plan to sell the ANDA product. Somebody who's providing a product but who doesn't sign the ANDA may not be liable. And this is where you get to common sense. When a foreign corporation decides to do business by setting up a related U.S. corporation that files its ANDAs and that intends to sell the product in the United States and thereby benefit directly from it, when you choose to do business like that, it seems in accordance with the purposes of the Hatch-Waxman Act for us to be able to litigate against all those ANDA submitters that can be found in the same place. And Apotex Corp. was a Delaware corporation and was amenable to suit right there in Delaware along with the rest of these guys and that we ought to be able to do that. Does it trouble you that the trial judge in Delaware thought that Apotex Corp. was not sufficiently related to Apotex Inc. to warrant bringing Apotex Inc. to the Delaware jurisdiction when Apotex Corp. was clearly subject to the Delaware court's jurisdiction so that the Delaware court said, I'm sorry Apotex Inc. I can't keep you in this suit. You're out of here. But you want to flip it the other way and make it work one way but not the other way. No, I'm not making it work at all. If you assume the trial court there was correct and we were unable to appeal that because it's an interlocutory order. If you assume the trial court was correct my contention is that Apotex Corp. based on the things that Apotex Corp. did and intends to do is a infringer under 271E1 and that the words submit in that patent law as construed by this trial judge and by the four other courts that look at it is broad enough. What I'm trying to figure out is how you can justify the Delaware court pushing Apotex Inc. out of its presence. Corp.'s presence was not sufficiently close to Inc. to bring them both in. If I may get to the 600 pound gorilla that is in the room here. What's going to happen is they are likely going to be collaterally estopped in Florida based on the judgment against Corp. They knew where the courthouse was in Delaware. They'd been there 13 times before and when they saw Judge Farnham they decided they didn't want to be there anymore and they tried to run away. But Judge Farnham had jurisdiction over Corp. and Corp. was found liable and when the day comes they're going to be estopped not because the corporate veil has been pierced but because their interests were at stake and its related company was involved and it knew its way to the courthouse and could have gotten there. That's what's going to happen. You don't need to pierce the corporate veil to get there. Have we explored this? I think we've examined this as far as we can. You probably would not allow me to reserve the rest of my time for the public. Thank you very much. Thank you Mr. Lipsy. Mr. Ward you have a minute and 16 seconds. A minute and 16 seconds. When you listen to Mr. Lipsy talk about the alleged evidence of error that's a problem. What happened is the district court conflated the evidence of this chaos and confusion related to equitable conduct and applied it and said well there must have been an error in claim scope. The evidence about chaos and confusion only went to the failure to disclose the Sandoz reference. It didn't say anything about whether the people involved in writing the claims and pursuing this case understood the reference and in fact as I said before the evidence says otherwise as I referenced Mr. Tamaki if you refer to JA 8537 and JA 2513-15 Mr. Tamaki says we understood the overlap. We went ahead. We made a strategic decision. Another point that Mr. Lipsy said was that the Wadlinger case says that actions taken in full consciousness can be error. That was rejected in the Serenkin case. Very clearly rejected. And finally with principal business, principal business is a post 1952 case and it makes sense. One should not be allowed to intentionally claim something over broad and when they realize there's an error, wait until it's advantageous for them to do something about it because that prejudices the public and in fact it's further evidence when you have a situation like that that there was not an error in the first place because normally if someone discovers an error they fix it. They fix it fast. The fact that they don't is evidence they don't think it's an error. Okay. Thank you. Thank you Mr. Ward. So Mr. Maddox I think you've exhausted your time. Mr. Breisflat you have a minute. I want to touch on a couple things real quickly. First of all Apotex Inc. was the submitter and they actually sent the ENDA to the FDA. If you look at JA01500 it's their letter. They're the ones who sent the letter to AstraZeneca and it's counsel. By they I mean Apotex Inc. and Apotex Inc. was the one who signed the paragraph 4 certification. They are the only submitter. I have seen nowhere in the patent law that having the intent somewhere in the future to maybe sell a product that may be approved makes you a submitter and makes you guilty of patent infringement and that's all they've argued with Apotex Corp. Thank you. Thank you Mr. Breisflat. The case is taken under submission. Thank you all. Thank you.